Chief Justice, Members of the Court, Counsel, my name is Chuck Brown. I represent Edison, in this case, from Lewiston, Idaho. I'm very honored to be in front of you, and thank you so much for all of your scheduling that took this into account. I'll make my comments brief. Speak up a little. Pardon? Speak up a little. Sure, Your Honor. Raise the mic, I don't know whether you can. You're too tall. I know people fail me. Your Honor, in regards to this case, what occurred when I filed the verified complaint is to simply enforce First Amendment right to attend the full execution process from the entry into the execution chamber onward. In response to that, the state staked out two positions. One is they filed statutory references indicating and implying that executions in Idaho had not been open to the public historically. So in regards to that, I filed an affidavit and asked the court to take judicial notice of the fact that, just like in California, just like you were faced with here, the statutory language was actually very similar. It said one thing, but actually history was something different. Judge Walsh actually read that. He said something in regards to his opinion as far as whether or not he was taking judicial notice of it, but then in his opinion he kind of ruled without question that I had established that executions in Idaho had been historically open to the public. Prior to 1899, they were done in a county level in an open plaza. After 1899, they were moved within the prison walls, but still media and the public had access to them. Is that still disputed, or is it now agreed upon? I really don't think that's disputed. It's not disputed in Judge Lodge's mind, and counsel can speak, but I really don't think it's disputed anymore, Your Honor. Then the last aspect, the next aspect that they threw out was their penological concerns, and I understand that you know a lot more about penological concerns. I don't get into that kind of case law, but if I understand what penological concerns are. It would be a good idea to get into that by now. Yes. If I understand what a penological concern is, Your Honor, it's the identifiable governmental interest at stake in this task, or the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry in the rehabilitation of the prisoners. So then in that regard, they filed two affidavits. In regards to those two affidavits, I didn't file a counter affidavit. I did not file a, despite them containing hearsay and lack of foundation, I didn't file a motion to strike, hearsay statements, and I didn't file a motion to strike because of a lack of foundation. So they've had an unfiltered ability to express to you what their penological concerns are in two affidavits. What they did is they filed an affidavit by the warden, primarily relying upon that, and what they did in that regard is he set forth their various penological concerns, and it's my position, my strong position, I feel strongly, that their penological concerns don't then rise to the level of what should be defined as a penological concern by this Court and by the United States Supreme Court. Well, the fourth one might be, possibly. Pardon? I mean, issues about the anonymity of the, or the concerns of the people involved in the execution, but that is to some degree covered by the California case. Exactly, the California case. As a matter of fact, when they say that as far as some sort of identity issue with the medical team, even there they don't express the level of concern that you were faced with in the Lopez case or the Woodford case or anything like that. They don't express anything even on that level. So anything that they have expressed has already been dealt with by this case, by this Court previously. And then in regards to the other penological concerns, they say, during the time leading up to Paul Rove's execution, and again with Mr. Levitt, there's a definite sense of awareness of their circumstances among the death sentence defenders. So some sensitivity towards the death, other people on death row, that simply doesn't rise. By definition, it doesn't rise to a penological concern. The warden says, based on my experience and observations, death sentence offenders do not want their deaths to be sensationalized or every minute detail leading up to their death reported to the public. These offenders are concerned about their families and friends, including other death sentence offenders, having to be subjected to media accounts of their deaths. These offenders want private dignity in the period of time leading up to their final moments. So now what they're saying is that the thing that's going to trump the constitutional right of access is the hurt feelings and the sensitivities of the individual that's going to be executed. The next one, he says, based on meetings with the mothers of Paul Rove and of Mr. Levitt, based on meetings with these mothers, it is my understanding that both of them wanted their sons to be afforded dignity in their final moments before the execution. The warden uses the word dignity five times throughout his affidavit in addressing the concerns that he has as far as the condemned family members, the mothers, or others on death row. I don't see anything in these affidavits concerning the mothers of victims. The fathers of victims, childhood sweethearts of victims, friends of victims, and that ties back into the public interest aspect of the program. Has Mr. Levitt, is there any evidence of what his wishes are in this case? All we have is this affidavit from the warden, Your Honor, nothing beyond that. You don't get anything from him saying, I'm fine with it? No. But the affidavit doesn't actually say even that Levitt said this. Right. That's correct, Your Honor. It says it's something weird and vague like it's my understanding or something like that. Well, I'm not sure that it even said there was an understanding about what Mr. Levitt said. Yeah, it doesn't even rise to that level. Also, one question I have is that Judge Lodge seemed to think, and I think the State has said that they would have to rewrite their protocol or revise the protocol. And I, so I'm wondering what in the protocol says this? Well, I don't have the data on the protocol for that. It doesn't refer to anything in the actual written statement. Written set of procedures say that the witnesses are going to come in at some point, not at some other point? Well, in regards to the protocol, in page 9 of my verified complaint, what it does is it goes through this time period. And what the one affidavit, I can't remember if it's the warden, the other one, they talk about this changing the curtain, closing the curtain and opening the curtain for that 20-minute time period. I know what they do, but I'm asking, or what they think they're going to do, but I'm asking is that in the protocol? No, the curtain part isn't in the protocol at all. So they don't in fact have to change the protocol? Exactly, that's right. But that curtain aspect isn't even addressed in the protocol that I can find anywhere. Counsel, it seems to me that the kind of thing Judge Berzon is asking about is something that we're going to really have to hear from the State. And you might want to save your time to reply to it, because I don't think the State has said anything very specific in these affidavits. And rather than ask you to guess at what change there might have to be in the protocol, you might want to hear what the State has to say about what changes they're going to make, because it's not in their affidavits. I agree, Your Honor. I think what you're saying is you've heard enough. Sit down is what I'm saying. Sit down. Thank you, Your Honor. Okay. We'll hear from the warden of the State. The warden, yes. Go ahead. Chief Judge, Associates, Counsel, my name is Michael Gilmore. I'm a Deputy Attorney General representing the appellees here. The movements for a preliminary injunction must show the district court that they satisfy several independent prongs of the preliminary injunction test. And if they are to satisfy any one of those prongs, there are sufficient grounds to deny a preliminary injunction. The district court here denied the preliminary injunction on multiple grounds. And so the appellants have the burden of showing that the district court was in error on every one of the grounds that the district court cited for denying the preliminary injunction. Well, as to lack of irreparable harm, wasn't he clearly wrong under our First Amendment cases? Don't we have multiple cases saying that the denial of a First Amendment right for a period of time is irreparable harm? I think the answer to that is a page of history is worth a volume of logic. And the history is what happened between CFA3, California First Amendment Coalition 3, and California First Amendment Coalition 4. Was there a preliminary injunction case in that? Neither of those appeals involved a preliminary injunction. No, there was a summary judgment that was appealed in number three. So what does it prove? It doesn't prove anything. There wasn't a preliminary injunction in that case. It's solid as far as I could tell. If I could go through the history, this is my understanding of what happened and why I think the history is important. Three was an appeal from a summary judgment. The court in three said that the incorrect standard had been used, that you started out with the deferential standards of Turner, and then you had to prove below that they were an exaggerated response to a legitimate penological objective. During the time that that case was remanded, four executions took place in California. Now, I don't know what happened in the district court. I don't know if they moved for a preliminary injunction between three and four. What I do know is that for two years the old protocol stayed in place and four executions took place because CFA4 tells us that. And so during that time, if during that time the case was developed and the parties had an opportunity to try whether there was an exaggerated response or no exaggerated response to legitimate penological objectives, the old procedure stayed in place, and it was only two years later after the remand that the district court then said, okay. Well, you're not suggesting that's a good model, that we ought to wait for four years to get an answer to this question? I'm suggesting that since CFA3 said a burden is upon the plaintiffs to show, and Judge Lodge said. Well, I don't have a clue what would have happened if somebody had asked for a preliminary injunction because nobody did. It's just irrelevant to anything. No, it's relevant to whether they met the burdens that are necessary. Judge Lodge said in this case they have not provided the evidentiary basis he needs to see that this is an exaggerated response to a legitimate penological objective. What is a legitimate penological concern? I mean, we have two affidavits. Do they show the legitimate penological concern? They articulate for three of which have never been addressed in the case law, which are the ones. Three of which are really what? I mean, they're called three, but they're basically what? They're variations on the, well, the first one is the interests of the condemned. The sensitivity to the family and the? Yes, and the family and the other members on death row. Are they incapable of speaking for themselves? I don't know if they are capable of intervening in the rapid time. Well, they don't have to intervene. You could have gotten an affidavit from someone. There's no indication. This is just pure theory that the State is certainly the guardian of the sensitivities of the family to people being executed? It's the warden's view of the best way to run the prison. But I'd like to focus. But there's also the fact of two other questions. One is, is there anything in the protocol that addresses this? The protocol, I was checking again. I don't remember the protocol stating the specific time when the curtain is opened. So the statement that you'd have to change the protocol is not true? You would have to change the procedure, but not the protocol. The procedure. And secondly, in fact, the State has always allowed witnesses, including the media, to view the execution. This is just a fine cut question of when. Yes. So the asserted interest having to do with the concerns for the condemned, the families, and so on, aside from everything else, are not, are not, with regards, it's still the case that people are going to watch them die. Yes. It certainly doesn't. Therefore, it's this very narrow little set of concerns, i.e., How much are they going to watch them die? Well, it's not a narrow set of concerns when we take into account the anonymity of the medical team. So that's what it comes down to. And that's in the California case. The question is, does that all have to be relitigated again? Yes. Why? Because anonymity in a State of 35 million people and anonymity in a State of 1.5 million people is very different. We don't know what the same considerations are. There are five members on this team. Idaho is a small town. I mean, Boise is a small town by California standards. Preserving their identities is much different. I just did some research. Marin County, where San Quentin is located, is in a metropolitan area of over 7 million people. Boise's metropolitan area is less than one-tenth of that. We're dealing with people. One of the other differences is if I understood CFA C-4 correctly, their medical team is assembled from within the prison system. Idaho's medical team are all outside people. They're all people with medical training. And their ability to maintain their anonymity is very important because they work in a community. So this is not prison staff? This is not. The medical team is not prison staff. So you can't say, well, there are so many staff members and people could identify one of them. You have a much larger pool of people. I mean, I can see you have a small group of people, and you find some guy that's as tall as your opposing counsel that's on the prison staff. They say it's probably him, right, even if his face is covered. But you're drawing from a much larger community. Well, you're drawing from a small community of medically trained EMT nurses. It's not the small community of the prison staff. It is a universe of people with medical training in somewhere in Idaho, probably in Boise. Well, they would be in the area, yes, not necessarily in Boise itself. Not necessarily in Boise. It could be in Montana, right? It could be in eastern Washington, right? Spokane or something. No, I don't think any of the medical team would be from that far away. But nevertheless, they work in the community in regular jobs, and they have a very keen interest in their anonymity and confidentiality. And what do we know about the ability to conceal the identity by – Okay, I'm sorry. Don't they get revealed once they draw back the curtain, or what are these people who are there and then withdraw before the curtain is drawn? How does that work? Under the current practice, they would insert the IDs out of the execution chamber room before the curtain is drawn. Under the practice that the Associated Press is proposing, that would be done on full view. So if any of them have unusual physical characteristics, if, to use an example, one of them were as tall as Mr. Brown, that might be a very easy way to figure out who did it. Right. California's been doing it. Ohio's been doing it. Arizona just announced today they're going to do it. What? You think that there's – at least on an early injunction basis, some basis to say – you have to put nothing in the record to show that Idaho's different in this regard. That you haven't done. What we have put in the record is that the warden or the deputy director of operations is very concerned his medical team may quit or may not be willing to do this. That's a different issue from whether their identity can be made known. And in the California case, they said that the surgical masks are a sufficient way to conceal the identity. But there's no identity problem. Now, you have two different points. One is whether their identity can be concealed, and you've suggested nothing that would make the method that California uses any different from yours, or why you couldn't conceal the identity. But the second point is a separate point, whether medical people might quit if this procedure were adopted. But all you've suggested about that is sort of speculation. Have you made any effort to contact the medical people here and see if they are planning to quit? In the hurry-up time which this is processed, we have not attempted to put that in the record. But Judge Lodge, when weighing those possibilities, thought that was a very legitimate interest. So that he also is speculating that that may happen. There's no evidence that there's any indication that anyone would quit. No. We have not provided in the record declarations under that assumption. And you've had since what, May 22nd? I think we were served a couple days later, but I could be incorrect. But in any event, the fact is that there's no indication in the record that anyone would quit, or even thinking of quitting. There's the deputy warden's concerns that he may lose team members. He's got concerns, Judge Lodge has concerns. I mean, that's pure speculation. I mean, you know, the deputy warden may speculate as to that. You might, and it could be an honest speculation. But that speculation is really not much better than anyone speculating about it. There's no reason to think anyone might quit. And there's certainly been a clear opportunity to find out. And how many people are involved in this, this team? There are five members of the medical team. Okay. Does the deputy warden say that he talked to them and any of them have expressed a concern about quitting or suggested they might quit? The affidavit is not that specific. So that's a no. Yes, that's a no. Isn't that a little weak on your part? I mean, if you look at California First Amendment Coalition 4, the opinion clearly says that there is a First Amendment right to view the entire execution, including the insertion of the needle, of the catheter, whatever they use. So that's established as a matter of circuit law, right? That was established as a mixture of circuit law and the district court's weighing of the evidence put before him on whether other things could – whether that was an exaggerated response in California or not an exaggerated response. That's a different question, whether there was an exaggerated response or not. That's a question of whether it outweighs the First Amendment. But there is a law of our circuit that the public right to view execution extends back to the point where the needles or the catheters are inserted. That doesn't go back further, I suppose. I mean, you could start the process way back when he talks to his minister. But anyway, that's the place where the execution is deemed to begin for First Amendment purposes under our case law, right? And at that point, it's up to the warden to come up with reasons why that is overcome. Many First Amendment interests are overcome for sufficient reasons. So as I see it, given that the burdens have shifted to the warden, it's a little strange that all he says is, I have these concerns, when he could easily talk to these folks there and ask them the question and at least report back something like, I was told by members of the execution team that they would quit. But he doesn't say that, right? He doesn't say that. But I think the Turner burden is on the plaintiffs, and that was the basis of Judge Lodge's decision. Having articulated these concerns, it was plaintiff's burden, plaintiff's obligation to show that these are exaggerated responses, not the State's at this point. A great deal of Judge Lodge's decision is based upon the fact that plaintiffs have not provided any evidence. Plaintiffs have the burden to show that these are exaggerated responses. How is the plaintiff supposed to do that? I mean, the warden can simply say, I'm concerned about this, I'm concerned about that, I'm concerned about that, and you prove them not, or you prove that, in fact, these people that you're not allowed to know who they are because they have this great interest in anonymity aren't going to quit, but you can't know who they are, so you certainly can't talk to them. So how are you supposed to prove it? You prove it by doing what Judge Lodge said you should have done. File the case a few months ago, start some discovery. And a few months ago, how would you have proven it? Well, you could do a discovery. You could ask to take a deposition of the deputy warden. Of the secret people? Well, we could have worked some. This could still be done. I mean, it could be done this afternoon. Hold an evidentiary hearing or do discovery? Do discovery. Are you willing to provide the warden for a deposition this afternoon? I don't even know the warden's whereabouts or availability at the moment, so in principle, yes, but I can't say that without even knowing where he is at the moment. Well, the warden's not going to be able to tell us anything anyway because he's just saying, I'm concerned about it. The warden would have to say, yes, I've spoken to these people and they're planning on resigning or leaving. Well, we don't know. He may have spoken. He may just not have said it in his affidavit. Well, and he may have spoken since then. If you were available for a deposition, he could be asked those questions. Maybe he'd come up with a whole wealth of knowledge that he didn't put in his deposition. But I think all of that feeds back into Judge Lodge's assessment of timeliness. This is something they've known about since last. But, in fact, they did raise this with you some time ago. Yes, there was a meeting in January. More than one, as I understand it, and exchanges of letters and so on. Right. And since February 1st. And if there were not a scheduled execution, would there not have been a viable lack-of-ripeness claim? We – they pled that there is not any danger of this becoming moot. We agreed with that. We realized the parties cannot confer jurisdiction. I'm not talking about moot. I'm talking about a lack of – I'm talking about ripeness. If there's no – nothing impending that's going to happen, they just could have walked in and said, we're going to bring a case now. You know, for some execution, it might occur sometime. Given the number of condemned prisoners in the pipeline in Idaho, we would not have raised a ripeness argument. We would have much preferred having this tried, if it's going to be tried, on a schedule where everybody has more than one or two weeks to get the case. So we would not have raised a ripeness argument. Well, you could still do that in the other cases. This is just a question of a preliminary injunction. And the preliminary injunction we can now decide on the basis of who's most likely to win or what the chances of success are. And that can – we can, based on the record we have, what are the chances of success. And it seems fairly clear from the California case and the importance of the First Amendment right that we can make a judgment. You can still go ahead if you want. And, you know, this is not – the preliminary injunction is not the end of the matter. You can try all of this if you really want to try these issues about what the warden's concerns, that the families really want all of this. The families are very concerned. And although they've never said anything to the court, your sensitivity about their concerns, you know, will be validated when all these depositions are taken. In the meantime, this is a preliminary injunction because there's an event scheduled. There is an event scheduled. And Judge Lodge has already waived the public interest and waived the equities. The court would have to reverse. I have the possibility to ask another similar question to the one Judge Kaczynski has been asking, that if you went back and talked to the warden and came back in a couple hours, you might be worth considering whether he would agree to this for this execution and litigate it later and not need an injunction to do it. That's essentially what's happened in Arizona now. And the question is, is there any point in your talking to the warden in the next hour or so in getting back to us? I will try, but I don't know if I can. Well, in any event, we're going to be here in the building having lunch. So if you have anything, you know, we won't get any opinion done, I would suspect, in the next two hours or so. And if there's any reason that you want to contact the court, you can certainly do that in the next couple of hours on any subject you would like. Just contact the deputy clerk and find out where you can find him. You can let us know. Okay, you're out of time at this point. Yes, by quite a bit. Thank you. We've got a little time left. Governor, do you want to hear from him? Well, you don't have to, whatever you do. Yeah, you don't have to use it. The only thing I'd say, two quick things, is that in regards to Boise, Boise is not a, it's a developed metropolis area. Ada County includes multiple towns. I think we know about Boise. I had got a lecture from one of our colleagues. I'm kidding. I talked about Pocono. As I was saying, he said about, talked about Boise State and its football team. He told me, well, that was the big city. That was a metropolitan area. That's right. Thank you, Governor. Thank you. Okay. Can I just argue a stance a minute? We are adjourned. All rise.
judges: Kozinski, Reinhardt, Berzon